921 F.2d 232
 119 P.U.R.4th 249, 21 Envtl. L. Rep. 20,347
 UPPER SNAKE RIVER CHAPTER OF TROUT UNLIMITED; Idaho
Environmental Council; So. Fork Coalition; Idaho
Sportsman Coalition; Marv Hoyt,
Plaintiffs-Appellants,
v.
Donald P. HODEL, in his official capacity as Secretary of
the Interior; C. Dale Duvall, in his official
capacity as Chief of the Bureau of
Reclamation, Defendants-Appellees,
Twin Falls Canal Co.; Committee of Nine; Aberdeen
Springfield Canal Co., et al.,
Defendants-Intervenors-Appellees-Intervenors.
 No. 89-35142.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 5, 1990.
Decided Dec. 17, 1990.
 
 Russell E. Webb, Radin & Webb, Idaho Falls, Idaho, for plaintiffs-appellants.
 George W. Van Cleve, U.S. Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for defendants-appellees.
 Steven K. Tolman, Nelson, Rosholt, Tobertson & Tolma, Twin Falls, Idaho, for defendants-intervenors-appellees-intervenors.
 Appeal from the United States District Court for the District of Idaho.
 Before KOELSCH, ALARCON and RYMER, Circuit Judges.
 KOELSCH, Circuit Judge:
 
 
 1
 The dispositive question on the appeal is this: Did the District Court err in concluding that the National Environmental Policy Act ("NEPA") did not require the Bureau of Reclamation ("Bureau") to prepare environmental impact statements ("EIS") before periodically adjusting the flow of water from the Palisades Dam?
 
 
 2
 We are clear that the answer is "No."
 
 
 3
 Several Idaho Sportsmen organizations and an individual plaintiff commenced this suit against the Secretary of the Interior and the Chief of the Bureau to secure injunctive relief and a declaratory judgment relating to the Bureau's control over the flow of water from the Palisades Dam and Reservoir. Plaintiffs' contention, in brief, was that the Bureau was, and is, required to complete an EIS before reducing the flow of water from the Dam to less than 2,000 cubic feet per second--later amended to 1,000 cfs.[1] Defendants opposed plaintiffs' motion for a preliminary injunction, and a number of irrigation companies who have contracts for storage of water in the reservoir were permitted to intervene as defendants.
 
 
 4
 Following an extensive evidentiary hearing, the parties submitted the entire case to the district court for a determination on the merits. The factual findings of the district court, 706 F.Supp. 737, are presented below.
 
 
 5
 * The Palisades Dam and Reservoir were constructed pursuant to an Act of Congress, and have been continuously managed and controlled by the Bureau since construction was completed in 1956. The Dam and Reservoir are one of a series of dams and reservoirs in the South Fork of the Snake River in Idaho and form part of the Bureau's Minidoka Irrigation Project. They are located between two other dams and reservoirs--the American Falls below and Jackson Lake above. The purpose of the Project is to control and conserve the waters in the River for fish and wildlife, recreation, irrigation, flood control, and power generation.
 
 
 6
 The amount of water in the Snake River fluctuates considerably from year to year, depending on the amount of snow pack in the mountains. The waters are impounded in the reservoirs and flow is controlled by the dams and regulated on the basis of annual cycles having four successive periods: the storage period extending from about October to March, the flood control period from that time until June, the refill period during which water not needed downstream is impounded, and lastly, the irrigation release period during the growing season in the summer months.
 
 
 7
 The Bureau's standard operating procedure since 1956 is to maintain the flow in the South Fork above 1,000 cfs. The Bureau has agreed to consult the Idaho Fish and Game Department before setting flows below 1,000 cfs. During previous dry periods, the average flow has been lower than 1,000 cfs for 555 days (or 4.75% of the total days in operation). Monthly average flow has been below 1,000 cfs during thirteen months of the Palisades' operation. According to the Bureau, the rate of release has fallen below 1,000 cfs in ten of the approximately 30 years of the Reservoir's operation.
 
 
 8
 Due to lack of precipitation, the Bureau reduced the flow from the Palisades Dam in November 1987 to increase water stored for irrigation. Likewise, 1988 was dry and the Bureau reduced the flow again to 750 cfs.
 
 
 9
 "It is without controversy" the district court pointed out in its findings "that reducing the stream flows below 1,000 cfs will have a negative impact on the downstream fishery." But the court nevertheless concluded and ruled that the extent of the injury to fish population in this "Blue Ribbon trout stream" was not material to the inquiry, and need not be resolved because
 
 
 10
 [i]n the case of the Palisades Dam, the fluctuating flows are routine actions which are contingent upon Mother Nature for snow-pack, runoff, precipitation, and carryover. As part of its routine and ongoing operations, the [Bureau of Reclamation] fluctuates the flows depending upon weather conditions past and future. Overall, the Court views the fluctuation of flows below Palisades as "ongoing operations" which do not have to comply with the EIS provisions of NEPA.
 
 
 11
 As noted earlier, we are clear that the district court's conclusion was correct.
 
 II
 
 12
 We review de novo any questions of law or mixed questions of law and fact. United States v. McConney, 728 F.2d 1195, 1201, 1205 (9th Cir.1984) (en banc). This court must accept the lower court's findings of fact unless clearly erroneous. Id. at 1200. If an agency decides not to prepare an EIS, the reviewing court must "determine whether the responsible agency has 'reasonably concluded' that the project will have no significant adverse environmental consequences." City of Davis v. Coleman, 521 F.2d 661, 673 (9th Cir.1975) (citing Save Our Ten Acres v. Kreger, 472 F.2d 463, 467 (5th Cir.1973)).
 
 
 13
 The National Environmental Policy Act requires all federal agencies to prepare a detailed Environmental Impact Statement for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. Sec. 4332(2)(C).[2] The Ninth Circuit has interpreted NEPA to require an EIS whenever a project "may cause a significant degradation of some human environmental factor." City of Davis, 521 F.2d at 673.
 
 
 14
 In this case we do not reach the issue of whether reducing the river flow below 1,000 cfs has a significant effect on the environment because the reduction does not constitute a "major Federal action" within the meaning of the statute.
 
 
 15
 The construction of the Palisades project was completed in 1956, and was in operation at the time NEPA became effective on January 1, 1970. Since NEPA does not apply retroactively, see Westside Prop. Owners v. Schlesinger, 597 F.2d 1214, 1223 (9th Cir.1979), an EIS cannot be required on the basis of the project's construction. However, if an ongoing project undergoes changes which themselves amount to "major Federal actions," the operating agency must prepare an EIS. See Andrus v. Sierra Club, 442 U.S. 347, 363 n. 21, 99 S.Ct. 2335, 2343 n. 21, 60 L.Ed.2d 943 (1979) (" '[M]ajor Federal actions' include the 'expansion or revision of ongoing programs.' ").
 
 
 16
 This circuit has held that where a proposed federal action would not change the status quo, an EIS is not necessary. "An EIS need not discuss the environmental effects of mere continued operation of a facility." Burbank Anti-Noise Group v. Goldschmidt, 623 F.2d 115, 116 (9th Cir.1980) (holding EIS unnecessary for federal financial assistance in purchasing an existing airport since federal action would not change status quo), cert. denied, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); see also Committee for Auto Responsibility v. Solomon, 603 F.2d 992 (D.C.Cir.1979) (holding government lease of parking area to new parking management firm does not trigger EIS requirement since area already used for parking so no change in status quo).[3]
 
 
 17
 We find the reasoning of the district court in County of Trinity v. Andrus particularly instructive. In Trinity the plaintiffs sought to enjoin the Bureau from lowering the level of a reservoir during the drought year of 1977 because of the potential damage to the fish population in the reservoir. The court explained that the issue was "not whether the actions are of sufficient magnitude to require the preparation of an EIS, but rather whether NEPA was intended to apply at all to the continuing operations of completed facilities." Id. at 1388. The court distinguished the case from cases "when a project takes place in incremental stages of major proportions," and from cases where "a revision or expansion of the original facilities is contemplated," id. Neither of these situations applied here, the court observed. Instead,
 
 
 18
 [t]he Bureau has neither enlarged its capacity to divert water from the Trinity River nor revised its procedures or standards for releases into the Trinity River and the drawdown of reservoirs. It is simply operating the Division within the range originally available pursuant to the authorizing statute, in response to changing environmental conditions.
 
 
 19
 Id. at 1388-89. The court then concluded that actions taken in operating the system of dams and reservoirs (in particular, operational responses in a drought year) were not "major Federal actions" within the meaning of NEPA.
 
 
 20
 The Federal defendants in this case had been operating the dam for upwards of ten years before the effective date of the Act. During that period, they have from time to time and depending on the river's flow level, adjusted up or down the volume of water released from the Dam. What they did in prior years and what they were doing during the period under consideration were no more than the routine managerial actions regularly carried on from the outset without change. They are simply operating the facility in the manner intended. In short, they are doing nothing new, nor more extensive, nor other than that contemplated when the project was first operational. Its operation is and has been carried on and the consequences have been no different than those in years past.
 
 
 21
 The plaintiffs point out that flow rates have been significantly below 1,000 cfs for periods of seven days or more only in water years 1977, 1982, and 1988, all years of major drought. They also note that prior to construction of the dam, the lowest recorded flow rate did not fall below 1400 cfs. From these facts, they argue that the Bureau's reduction of the flow below 1,000 cfs is not a routine managerial action. However, a particular flow rate will vary over time as changing weather conditions dictate. In particular, low flows are the routine during drought years. What does not change is the Bureau's monitoring and control of the flow rate to ensure that the most practicable conservation of water is achieved in the Minidoka Irrigation Project. Such activity by the Bureau is routine.
 
 
 22
 Because we find no EIS is required, we need not consider the district court's rulings on damage to wildlife in addition to fish.
 
 
 23
 The district court's judgment is AFFIRMED.
 
 
 
 [1]
 Although the dispute in the district court involved the flow rate to be established for water year 1989, this case is not moot since reducing the flow below 1,000 cfs is conduct "capable of repetition yet evading review." United States v. Oregon, 657 F.2d 1009, 1012 n. 7 (9th Cir.1982)
 
 
 [2]
 42 U.S.C. 4332(2)(C) provides:
 The Congress authorizes and directs that, to the fullest extent possible: ... (2) all agencies of the Federal Government shall--
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 
 
 [3]
 NEPA Regulations issued by the Council on Environmental Quality are not to the contrary. Although the regulations contemplate the applicability of the EIS requirement to ongoing programs and actions of the government, see, e.g., 40 C.F.R. Secs. 1502.1, 1508.18(a) (1988), such ongoing activity must rise to the level of major federal actions to warrant preparation of an EIS. See County of Trinity v. Andrus, 438 F.Supp. 1368, 1388 (E.D.Cal.1977)