52 F.3d 334
 42 ERC 1190
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
OREGON NATURAL RESOURCES COUNCIL, INC., an Oregon non-profit
corporation; Wendell Wood; Mark Gaffney,
Plaintiffs-Appellants,
v.
BUREAU OF RECLAMATION; United States Department of
Interior; Kirk Rodgers, in his capacity as Project Manager,
Klamath Project Mid-Pacific Region, Bureau of Reclamation,
United States Department of the Interior; Dennis Underwood,
in his capacity as Commissioner, Bureau of Reclamation,
United States Department of the Interior; Manual Lujan, in
his capacity as Secretary, United States Department of the
Interior; Defendants-Appellees.
and
Klamath Basin Water Users Protective Association and
Tulelake Irrigation District, Intervenors.
 No. 93-35591.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 8, 1994.
Filed Oct. 14, 1994.
Withdrawn April 4, 1995.
Decided April 7, 1995.
 
 1
 Appeal from the United States District Court, for the District of Oregon, D.C. No. CV-91-06284-MRH; Michael R. Hogan, District Judge, Presiding.
 
 D.Or., 37 F.3d 1414
 
 2
 DISMISSED IN PART, AFFIRMED IN PART.
 
 
 3
 Before: BROWNING, KOZINSKI, and NOONAN, Circuit Judges
 
 
 4
 MEMORANDUM*
 
 
 5
 Oregon Natural Resources Council, Inc., et al., filed suit against the Bureau of Reclamation, et al., alleging the Bureau's activities at the Klamath Irrigation Project violated the Endangered Species Act, 16 U.S.C. Sec. 1531 et seq. Later amendments to the complaint added claims that the Bureau failed to comply with the National Environmental Policy Act, 42 U.S.C. 4321 et seq. ("NEPA"). The Council appeals the district court's summary judgment for the Bureau on the NEPA claims.
 
 I.
 
 6
 The water levels in Klamath Lake and Clear Lake, which are part of the Project, are controlled by dams. Water is released as required to meet the irrigation needs of the Project. In recent drought years, the Bureau has maintained water levels of the lakes at historic lows. The Bureau applies aquatic herbicides to the Project's waterways. The herbicides poison two endangered species: the shortnose sucker and the Lost River sucker. The Council alleges the Bureau failed to comply with NEPA's procedural requirements before lowering water levels and applying aquatic herbicides. The district court held NEPA did not apply because these activities were ongoing on January 1, 1970, the effective date of NEPA, and therefore did not constitute "major federal action" subject to NEPA. We agree.
 
 
 7
 The Council fails to present evidence creating a genuine dispute as to whether the post-NEPA changes in water levels constituted a "major Federal action." 42 U.S.C. Sec. 4332(C); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). It is undisputed that water levels in Upper Klamath Lake have been raised and lowered by the Bureau to meet changing needs and water supplies since the inception of the project. See Upper Snake River Chapter of Trout Unlimited v. Hodel, 921 F.2d 232, 235 (9th Cir.1990) (federal dam project's adjustments of water level were "routine managerial actions regularly carried on from the outset [of the project]" and thus NEPA did not apply). In rebuttal, the Council offers only the conclusions of persons it identifies as "expert and lay witnesses" stating that the Bureau's activities constitute "major federal action." See Leer v. Murphy, 844 F.2d 628, 631 (9th Cir.1988) ("The party opposing summary judgment may not rest on conclusory allegations, but must set forth specific facts showing that there is a genuine issue for trial.") The Council has presented no evidence that the Bureau departed from its ongoing, pre-NEPA routine of "monitoring and control[ling] the flow rate to ensure that the most practicable conservation of water is achieved." Upper Snake River, 921 F.2d at 235-36.
 
 
 8
 The Council also failed to create a triable issue as to whether the Bureau's use of aquatic herbicides constituted "major Federal action." The Council presented no evidence rebutting the declaration of a former Bureau employee that he witnessed the use of aquatic herbicides during the period from 1967-71. The general statement in a 1989 memorandum to the Bureau from the Fish & Wildlife Service indicating that the herbicides had been used "for the past decade or so" is not sufficiently specific to create a triable issue. See Int'l Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir.1985) (once movant has met initial burden of showing "absence of material factual issues," nonmovant "must counter with specific factual allegations revealing a genuine dispute of fact").
 
 
 9
 The listing of the suckers as endangered species in 1988 did not convert the Bureau's ongoing activity of annual herbicide spraying into "major Federal action." Only changes in the program itself constitute "major Federal actions." See 40 C.F.R. Sec. 1508.18; Andrus v. Sierra Club, 442 U.S. 347, 361-63 & nn. 20 & 21 (1979); Upper Snake River, 921 F.2d at 234-35.
 
 II.
 
 10
 In 1992, the Bureau dredged the silt from a channel between the eastern and western lobes of Clear Lake to allow water from the eastern lobe to flow to the western lobe for release for irrigation. The Council contends the Bureau should have complied with NEPA's procedural requirements. The Council's claim is moot.
 
 
 11
 We lack jurisdiction over a claim "to which no effective relief can be granted." Headwaters, Inc. v. Bureau of Land Management, 893 F.2d 1012, 1015 (9th Cir.1989). The question is not whether the precise relief the Council sought when filing its action is still available, but whether any effective relief might be available. Id. The Bureau completed the dredging in 1992 and is not considering further dredging. The channel is once again under water. See id. at 1015-16 (claim for declaratory relief moot where challenged activity too remote and speculative to have adverse effect on existing interests of the parties); Friends of the Earth, Inc. v. Bergland, 576 F.2d 1377, 1379 (9th Cir.1978) ("Where the activities sought to be enjoined have already occurred, and the appellate courts cannot undo what has already been done, the action is moot.").
 
 
 12
 The challenged action is not "capable of repetition yet evading review." See Headwaters, 893 F.2d at 1016. There is no reasonable expectation that further dredging will occur.[1] If the Bureau decides to dredge the channel again, the Council may seek a stay pending appeal to permit a judicial determination prior to dredging. See id.
 
 III.
 
 13
 The Bureau attempted to salvage fish stranded in drained irrigation canals by transporting them to hatcheries. The district court held salvaging the sucker fish from the drained irrigation canals and transporting some of them to hatcheries was activity categorically excluded from NEPA. We agree.
 
 
 14
 Agency action mandated by statute does not trigger NEPA coverage. National Wildlife Federation v. Espy, No. 92-35568, slip op. 855, 867 (9th Cir. January 20, 1995); see also Pacific Legal Foundation v. Andrus, 657 F.2d 829 (6th Cir.1981) (NEPA compliance not required where agency had a mandatory duty to list endangered species under the Endangered Species Act); South Dakota v. Andrus, 614 F.2d 1190, 1193 (8th Cir.1980) (issuance of a mineral patent not subject to NEPA because a "nondiscretionary act"). The Bureau was required by the Fish and Wildlife Service to undertake the salvage operation as part of the Bureau's compliance with the Endangered Species Act.[2]
 
 
 15
 DISMISSED IN PART; AFFIRMED IN PART.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The water level rarely drops to a level allowing dredging of the channel. The last instance of such low levels occurred during the 1930's
 
 
 [2]
 In several of its biological opinions issued to the Bureau, the Fish and Wildlife Service included incidental take statements requiring the Bureau to follow its recommendations, one of which was to salvage stranded fish by transporting them to other waters. See, e.g., Biological Opinion at 20 (August 14, 1991); Biological Opinion at 40-41 (July 22, 1992). These requirements were mandatory for the Bureau. See, e.g., Biological Opinion at 19 (August 14, 1991) ("The measures described below are non-discretionary, and must be undertaken by the agency."); Biological Opinion at 40 (July 22, 1992) (same)