JUSTICE GRAY,
dissenting.
I must respectfully dissent from most of the Corut’s opinion and from the result it reaches. My main problems with the opinion are its overbreadth and its lack of clarity concerning which MEPA statutes or regulations the Court determines DSL actually violated here. If the Court made even a passing analysis of Montana law in resolving *385 this case in favor of appellants, I undoubtedly would join in the opinion; I cannot do so as the opinion is written.
I agree that the standard of review of the MEPA decision at issue in this case is the “unlawful or arbitrary and capricious” standard set forth in North Fork. Unfortunately, the Court does not clearly apply that standard in resolving this case.
I also agree that, in Kadillak, we stated that it was appropriate to look to federal interpretations of NEPAin interpreting MEPA. However, nothing in Kadillak or any other source authorizes this Court to dispense altogether with applying Montana law and merely apply broad statements from selected federal cases to the factual scenario before us without any discussion of how and why those statements are applicable here. The result of this approach by the Court is a lack of analysis regarding which particular provisions of MEPA and the controlling regulations have been violated and a total lack of guidance to state agencies attempting to comply with the critically important MEPA and to state courts attempting to ensure such compliance. I cannot agree.
The lack of specificity in the opinion makes it difficult to craft an appropriate dissent. Thus, I offer only the following concerns and questions about the authorities on which the Court relies in resolving this case.
The Court’s primary thesis about MEPA appears early in — and permeates — its opinion. According to the Court, the guiding premise of MEPA is that “[generally, state action significantly affecting the quality of the human environment requires MEPA analysis.” Section 75-1-201(1)(b)(iii), MCA, is cited for this proposition. The problem with the Court’s approach is that “generalizing” about this pivotal statute is both misleading and erroneous.
The statute actually says that, “to the fullest extent possible!,] ... all agencies of the state ... shall include in every recommendation or report on proposals for projects, legislation, and other major actions of state government significantly affecting the quality of the human environment” a detailed statement regarding environmental impacts and effects. Section 75-1-201(1)(b)(iii), MCA. The Court does not analyze the meaning of “to the fullest extent possible.” More importantly, nowhere does the Court establish that any “recommendation or report on a proposal” for a major action of state government is at issue in this case.
Most important of all, the Court never bothers to apply the definition of “action,” vis-a-vis § 75-1-201(1)(b)(iii), MCA, which is found in *386 § 26.2.642(1), ARM, to DSL’s “allowing” of a change of use after a grazing permit is in place and the change of use has occurred. An “action,” insofar as it is relevant here, is “a project or activity involving the issuance of a lease, permit, license, certificate, or other entitlement for use or permission to act” by the agency. Section 26.2.642(1), ARM. As the Court concedes, no activity involving the issuance of a lease is at issue here. Thus, this straightforward definition simply does not support the Court’s conclusion that “if a changed use or condition ... significantly affects the quality of the human environment, then the state’s allowing that change in use or change in condition is a major state action pursuant to MEPA, triggering the MEPAreview process.” Nor does the Court provide any other support — under MEPA or otherwise — for this proposition.
Instead, the Court cites to one United States Supreme Court case and one Ninth Circuit Court of Appeals case which it apparently believes support its conclusion. Neither case does so even through the broad language quoted, much less through an actual application of those cases to the facts presently before us.
It is true that in Andrus v. Sierra Club (1979), 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943, the United States Supreme Court observed that major federal actions include the “expansion or revision of ongoing programs;” it did so in the context of resolving the issue of whether appropriation requests constitute “proposals for major federal actions” under NEPA. It concluded that appropriation requests were requests to fund action already proposed, rather than proposals for major government actions to be taken in the future. Sierra Club, 442 U.S. at 361-63, 99 S.Ct. at 2343. Sierra Club has no direct applicability here; it leaves unanswered, as does this Court, the specific question of what constitutes an expansion or revision of an ongoing program. Sierra Club does point out, however, that the “proposal” language in NEPA — like that in MEPA — is intended to have some meaning, a meaning never addressed by this Court in the present case. Indeed, this Court’s purpose in quoting from Sierra Club — other than to insert broad and inapposite language — remains a mystery.
Similarly, the Court’s reliance on Upper Snake River Chapter of Trout Unlimited v. Hodel (9th Cir. 1990), 921 F.2d 232, is misplaced. While that opinion does state that “if an ongoing project undergoes changes which themselves amount to ‘major Federal actions,’ the operating agency must prepare an EIS,” the Ninth Circuit was referring to the definition of “major Federal action” contained in *387 NEPA. Whatever the definition under NEPA, the case before us is governed initially by the specific definition of “action” contained in § 26.2.642, ARM. Even accepting the Ninth Circuit’s broad language, however, this Court does not apply the quoted language to the facts before us. It does not specify how, in this case, a change in an ongoing project exists, much less how such a change amounts to state action as “action” is defined in § 26.2.642(1), ARM, or to “major” state actions as the term is used in § 75-1-201(1)(b)(iii), MCA.
Moreover, I note that in Upper Snake River, the Ninth Circuit concluded, applying the NEPA definitions, that the Bureau of Reclamation’s reduction of the flow of water from the Palisades Dam on the South Fork of the Snake River in Idaho was not a major federal action. Upper Snake River, 921 F.2d at 234. It reached that conclusion in advance of any consideration of whether the action at issue had a significant effect on the environment and, indeed, declined to reach the “significant effect” issue “because the reduction does not constitute a ‘major Federal action’ within the meaning of the statute.” Upper Snake River, 921 F.2d at 234. Thus, to the extent Upper Snake River has any application here, it clarifies that a court must first determine whether the action at issue comes within the controlling definitions of “major action;” only when that question is answered in the affirmative may the court proceed to questions involving the significance of any impacts or effects from the action at issue. In the case before us, the Court essentially turns the questions around and becomes mired in the “significance” questions prior to having applied the controlling definitions to determine whether the “action” at issue triggers MEPA analysis at all.
Finally, with regard to Upper Snake River, I reiterate that the Ninth Circuit concluded that the Bureau of Reclamation’s substantial reduction in water flow from the Palisades Dam did not constitute a major federal action under NEPA. How, then, even assuming identical controlling definitions, can DSL’s “nonaction” in this case constitute a major action of state government? The Court does not explain.
The Court notes its agreement with DSL’s argument that, if an agency does not have an affirmative duty to act, the failure to act does not trigger NEPA or, presumably, MEPA. It then quotes from Sierra Club v. Hodel (10th Cir. 1988), 848 F.2d 1068, for the proposition that “if an agency’s duty to avoid environmental harm is mandatory, then the agency’s inaction constitutes an action for NEPA purposes.” The Court does not explain how the case relates to the situation before us *388 and it is my view that the case is, like those referenced above, inapplicable here.
In Sierra Club, the agency’s mandatory environmental duty did not spring from NEPA itself. There, the Tenth Circuit determined that the Secretary’s nondegradation duty toward wilderness study areas was mandatory under the Federal Land Policy Management Act of 1976. Sierra Club, 848 F.2d at 1075. In addition, the court determined that, even if the Secretary’s activity amounted to “nonaction” under the language of NEPA § 102(2)(c), requiring an EIS in advance of “major Federal actions,” a Council on Environmental Quality (CEQ) regulation specifically made the Secretary’s failure to act a “major federal action” for NEPA purposes. Sierra Club, 848 F.2d at 1091.
No regulation corresponding to the CEQ regulation at issue in Sierra Club — which made the “nonaction” a major federal action triggering NEPA — is involved in this case. Thus, I cannot see how Sierra Club has any application here or how it supports in any way the Court’s conclusion that “[w]hen the DSL is made aware of changes in the existing conditions or uses relating to a lease or permit, and those changes have the potential to significantly affect the quality of the human environment, then the DSL must, pursuant to MEPA, evaluate those changes for significant impacts.”
Under the Court’s decision in this case, what are state agencies or district courts to make of the clear thrust of the regulations implementing MEPA which focus on MEPA being triggered for “proposed actions”? "What, for example, is the meaning of § 26.2.641, ARM, captioned Policy Statement Concerning MEPA Rules, which states that in order to fulfill the statutorily-stated purpose of MEPA, agencies must conform to the rules at §§ 26.2.642 et seq., ARM, “prior to reaching a final decision on proposed actions covered by MEPA”? Or the definition of an EA at § 26.2.642(9), ARM, as an analysis of a “proposed action to determine whether an EIS is required” or to serve one of the other purposes described in § 26.2.643(2), ARM? Or the general requirements of the environmental review process set forth in § 26.2.643, ARM, which repeatedly specify “proposed action”? Or, critically, the requirement in § 26.2.644, ARM, setting forth the criteria to be used in determining “the significance of impacts associated with a proposed action.” How and when does a nonaction or a nondecision after a change of use in a state grazing permit come within the “proposed action” language which permeates the controlling regulations and the legislative policy statement in § 75-1- *389 201(1)(b)(iii), MCA? The Court never explains, and I submit that the Court’s decision today provides state agencies with no basis for evaluating when, under MEPA and the controlling regulations, MEPA will be triggered.
Finally, I feel compelled to comment on the ease with which the Court concludes not only that MEPA was triggered, but also that an EIS must be prepared. Again, the Court relies for its conclusion on broad statements from United States Courts of Appeal decisions holding that an EIS is required whenever a person alleges facts which, if true, show that the action/inaction “may” significantly degrade some human environmental factor. Again, no Montana statutes or regulations are cited or applied. Specifically, for example, the Court does not explain how the cases upon which it relies square with the clear language in § 75-1-201, MCA, that a detailed environmental statement is required for proposals for major state actions “significantly affecting the quality of the human environment.” Nor does it address in any way the criteria set forth in § 26.2.643, ARM, for when a state agency must prepare an EIS, in particular the mandate that an EIS is required when “the proposed action is a major action of state government significantly affecting the quality of the human environment.” Section 26.2.643(1)(b), ARM. How does the “significantly affecting” language in the Montana statute and regulation support the Court’s conclusion that an EIS is required whenever an action (or, according to the Court, inaction) may significantly affect the environment? Are state agencies to totally disregard MEPA statutes and regulations hereafter? The Court does not explain.
I close by restating here what I stated at the outset: the troubling aspects of the Court’s opinion in this case are its lack of analysis of Montana statutes and regulations and the resulting lack of guidance for all concerned in these important matters involving our cherished environment. If a case can be made under MEPA for the Court’s decision here, the Court has not made it. For that reason, I cannot join in the Court’s opinion. I dissent.
CHIEF JUSTICE TURNAGE joins in the foregoing dissent of JUSTICE GRAY.