**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, *Petitioner*, | No. 12-70338 |
| v. | OPINION |
| BONNEVILLE POWER ADMINISTRATION, *Respondent.* | |

On Petition for Review of an Order of the
Bonneville Power Administration

Argued and Submitted October 6, 2014
Portland, Oregon

Filed June 21, 2016

Before: Alex Kozinski, Ferdinand F. Fernandez
and Andre M. Davis,[*] Circuit Judges.

Opinion by Judge Kozinski

---

[*] The Honorable Andre M. Davis, Senior Circuit Judge for the U.S. Court of Appeals for the Fourth Circuit, sitting by designation.

# SUMMARY[**]

## Environmental Law

The panel denied a petition for review of a decision of the Bonneville Power Administration to move forward with a proposal to change how the Albeni Falls Dam in the Pacific Northwest operates during winter months without first preparing an environmental impact statement under the National Environmental Policy Act.

Lake Pend Oreille, which serves as the dam's reservoir, is jointly managed by the Army Corps of Engineers, the Bonneville Power Administration, and the Bureau of Reclamation. In the initial winter months of the dam's operation, starting in the late 1950s, the Corps fluctuated the level of the lake, but in some years the Corps held the lake's level constant. From 1997 to 2011, the Corps held the lake's level constant. In 2011, the agencies confirmed in an environmental assessment that they planned to return to a more flexible approach and allow the lake level to fluctuate.

NEPA only requires the preparation of an environmental impact statement when a proposed federal action is major, but "where a proposed federal action would not change the status quo," an environmental impact statement is not required. *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990).

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the agencies complied with NEPA when they finalized their 2011 decision without preparing an environmental impact statement. The panel held that holding lake levels constant from 1997 to 2011 did not change the status quo, and reverting to the previous regime of fluctuating the lake levels did not change the status quo either.

The panel held that because the agencies' decision adopting flexible winter operations did not trigger NEPA's requirement to publish an environmental impact statement, petitioner's challenges to the environmental assessment's finding of no significant impact were moot. The panel held that petitioner did not properly raise a challenge to the Bonneville Power Administration's failure to prepare a supplemental environmental impact statement addressing the effects of the flowering rush on the dam's operation.

**COUNSEL**

Bryan Hurlbutt (argued), Advocates for the West, Boise, Idaho, for Petitioner.

Hub V. Adams (argued), Attorney; Jacilyn R. Margeson, Assistant Attorney General; Randy A. Roach, General Counsel; Bonneville Power Administration, Portland, Oregon; David J. Adler, Special Assistant United States Attorney; S. Amanda Marshall, United States Attorney; Stephen J. Odell, Assistant United States Attorney; United States Attorney's Office, Portland, Oregon; for Respondent.

**OPINION**

KOZINSKI, Circuit Judge:

Operated by the Army Corps of Engineers (Corps), the Albeni Falls Dam helps provide power to the Pacific Northwest. The Bonneville Power Administration (BPA) is charged with marketing the power generated from the dam. In 2011, the agencies decided to change how they operated the dam during the winter months. We consider whether they complied with the National Environmental Policy Act (NEPA) when they finalized this decision without preparing an environmental impact statement.

**FACTS**

The Albeni Falls Dam straddles the Pend Oreille River, which connects Lake Pend Oreille and the Columbia River. Completed in 1957 as part of the Federal Columbia River Power System, it is jointly managed by the Corps, BPA and the Bureau of Reclamation. Like other dams in the System, the Albeni Falls Dam is operated to balance a variety of competing objectives, such as flood control, power generation, navigation and wildlife conservation.

Lake Pend Oreille serves as the dam's reservoir. When water is released from the lake, it drives turbines that generate electricity. This decreases the reservoir's depth and causes its shoreline to recede. For decades, the Corps maintained the flexibility to generate power during the winter months. In the initial winters of the dam's operation, starting in the late 1950s, the Corps fluctuated the level of the lake to generate power as needed. In some years, however, the Corps held the lake's level constant, often near 2051 feet.

In 1995, the Corps determined that allowing the lake's elevation to drop during the winter months had adverse effects on the kokanee salmon population and so beginning in 1997 began holding the lake's elevation constant. But in 2009, BPA urged the Corps to return to a more flexible approach to winter dam management. After two years of discussions and a public comment period, the agencies confirmed in a 2011 environmental assessment (EA) that they planned to follow through with BPA's proposal. The plan for "flexible winter power operations" gives the Corps the option each winter to store water in the reservoir and then release it through the dam according to power needs. Thus, instead of keeping the lake's level constant, the Corps may allow it to rise and fall by as much as five feet during the winter.

The EA concludes that the proposed winter fluctuations will have no significant environmental impact. Accordingly, the agencies decided to move forward with the proposal without preparing an environmental impact statement (EIS). *See* 40 C.F.R. §§ 1501.4(b)–(c), 1508.9. Petitioner challenges this decision as a violation of NEPA and asks us to require BPA to prepare an EIS. We have original jurisdiction pursuant to the Northwest Power Act. 16 U.S.C. § 839f(e)(5).

## DISCUSSION

NEPA, which applies to all federal agencies, 42 U.S.C. § 4332, doesn't dictate particular policy outcomes; instead, it regulates the manner in which agencies arrive at them. Specifically, for all "major Federal actions significantly affecting the quality of the human environment," the agency must prepare an EIS, which is a detailed study examining the environmental consequences of its decision. *Id.*

§ 4332(2)(C). An EA is meant to briefly document the reasons for the agency's determination whether an EIS is required. 40 C.F.R. § 1508.9; *see Cascadia Wildlands* v. *Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015). The EA here concludes that no EIS is required because the proposed action will not "result in any new significant impacts to the human environment."

**1.** NEPA only requires the preparation of an EIS when a proposed federal action is major. *See Upper Snake River Chapter of Trout Unlimited* v. *Hodel*, 921 F.2d 232, 234–35 (9th Cir. 1990). A federal action that may have significant environmental impacts need not "also be 'major' in an economic or some other nonenvironmental sense to trigger the EIS requirement." *City of Davis* v. *Coleman*, 521 F.2d 661, 673 n.15 (9th Cir. 1975); *see* 40 C.F.R. § 1508.18 ("Major reinforces but does not have a meaning independent of significantly."). But when an agency, responding to changing conditions, makes a decision to operate a completed facility "within the range originally available" to it, the action is not major. *Upper Snake River*, 921 F.2d at 235 (quoting *Cty. of Trinity* v. *Andrus*, 438 F. Supp. 1368, 1388 (E.D. Cal. 1977)). In other words, "where a proposed federal action would not change the status quo, an EIS is not necessary." *Id.*; *accord San Luis & Delta-Mendota Water Auth.* v. *Jewell*, 747 F.3d 581, 646 (9th Cir. 2014).

*Upper Snake River* involved a challenge to the Bureau of Reclamation's management of the Palisades Dam. *Upper Snake River*, 921 F.2d at 233. Reclamation typically ensured that water flowed into the Snake River at a rate of at least 1,000 cubic feet per second. *Id.* In response to a drought, the agency reduced water flow below that rate in two consecutive years and wanted to do so a third time without preparing an

EIS. *Id.* at 233 & n.1, 234. We acknowledged that, "if an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an EIS." *Id.* at 234. But Reclamation was not effecting a substantial operational change or expanding the Palisades Dam's original facilities. Instead, the agency was doing what it had always done: "from time to time and depending on the river's flow level, adjust[ing] up or down the volume of water released from the Dam." *Id.* at 235. Accordingly, we found that Reclamation did not need to prepare an EIS. *Id.* at 236.

If the agencies in our case have consistently fluctuated winter lake levels, formalizing that approach would not be a major federal action because the agencies would be "doing nothing new, nor more extensive, nor other than that contemplated when the [Albeni Falls Dam] was first operational." *Id.* at 235. The Corps fluctuated the elevation of Lake Pend Oreille in many winters prior to 1997, and various dam management strategies considered in a 1995 EIS included elements of what is now the proposal for flexible winter operations. Accordingly, the question is whether holding lake levels constant from 1997 to 2011 changed the status quo. If not, then reverting to the previous regime doesn't change the status quo either.

The Corps discussed holding winter lake levels constant in an EA published in 1995. This document reviewed a proposal for a three-winter test to hold the lake at a high minimum and found that doing so would have no significant environmental impacts. BPA and the Corps subsequently published Records of Decision putting this plan into action. We have explained that the time for an EIS is when an agency undertakes a "significant shift of direction in operating policy." *Grand Canyon Trust* v. *U.S. Bureau of Reclamation*,

691 F.3d 1008, 1022 (9th Cir. 2012) (as amended). And, for purposes of NEPA, the term "[m]ajor reinforces but does not have a meaning independent of significantly." 40 C.F.R. § 1508.18. Thus, this short-term decision, which was found to have no significant environmental impact, could not have constituted a major federal action because it wasn't a significant or long-term change in operating policy. In short, it did not change the status quo.

Actions taken with respect to winter dam management since 1995 reinforce the conclusion that there was no change to the status quo. As mentioned, the plan to hold winter lake levels constant began as a three-year test. The agencies managing the dam twice decided to carry forward this management strategy at the urging of the U.S. Fish and Wildlife Service. It's also notable that, since 2000, an interagency team has met each year to recommend the lake's constant elevation for the coming winter. In four winters from 1996 to 2011, Lake Pend Oreille was held near 2051 feet; the lake was also held near that elevation in eight winters between 1980 and 1995. *See Upper Snake River*, 921 F.2d at 235 (finding that even if an agency had only engaged in a proposed action sporadically in the past, that was enough to show that repeating that action did not change the status quo). As in *Upper Snake River*, the agencies here considered each year how to manage the Albeni Falls Dam based on that year's conditions. The Corps never relinquished its authority to fluctuate the lake's elevation in response to power demands: The Corps' 2002 Water Control Manual notes that Lake Pend Oreille "is usually operated" within a one-foot range above the winter minimum, but that "storage above [that minimum] may be used for . . . unscheduled hydropower operations." Thus, from 1997 to 2011, the agencies maintained the discretion they have

always had to respond annually to changing conditions. *See id.* Continuing to do so did not change the status quo.

Because the period when the agencies held winter lake levels constant did not change the operational status quo, neither does the decision to revert to flexible winter operations. Power generation has always been among the central concerns in operating the dam. For example, a 1948 Army report on plans for the dam explained that, "[d]uring the fall and winter period when regional power supply is lowest and power loads are greatest, the stored water [at Lake Pend Oreille] will be drawn upon for power purposes." The EA echoes that report, noting that "[t]he purpose of [flexible winter operations] is to more efficiently use the available water storage capabilities at AFD to generate power during the winter" and that "[s]toring water in the near term will provide power benefits at a future date when that water is released[,] . . . depend[ing] on power prices, load demand, and conditions at [another dam]." As the EA further explains: "Historically, winter power operations have been associated with [releasing] water for power. Water was stored for power operations during the winter in the 1980s and early 1990s." Thus, in some winters the lake has fluctuated, and in others it hasn't. Accordingly, the agencies will be doing "nothing new, nor more extensive, nor other than that contemplated when the project was first operational." *Upper Snake River*, 921 F.2d at 235.

Petitioner argues that *Upper Snake River* is distinguishable because "[u]nder existing operations, the Corps maintains steady lake levels throughout winter," while under flexible winter operations, "lake levels would be raised and lowered over a five-foot range up to three times every winter for the life of the Dam." But Petitioner's view of

"existing operations" is incorrectly limited to operations since the publication of the 1995 EA. Moreover, Petitioner mischaracterizes the proposal. According to the current EA, it's "unlikely" that lake levels would rise and fall over a five-foot range three times every winter—a variety of factors, such as power demand and weather conditions, will influence how the agencies operate the dam each year. Additionally, there may still be winters where the agencies hold the lake's level constant in order to facilitate kokanee reproduction. Thus, the flexible winter operations proposal comprises elements of both earlier and more recent management strategies. These details support the conclusion that the agencies charged with operating the Albeni Falls Dam will do so in accordance with the status quo. *Id.*; *see also Grand Canyon Trust*, 691 F.3d at 1022.

Petitioner finally argues that implementing flexible winter operations requires an EIS because the continued operation of the Albeni Falls Dam is itself a major federal action that significantly affects the human environment. *See* 40 C.F.R. § 1508.18(a) ("Actions include new and continuing activities . . . ."). But decisions made as a part of the ongoing operation of a federal project must themselves "rise to the level of major federal actions to warrant preparation of an EIS." *Upper Snake River*, 921 F.2d at 235 n.3. Requiring an agency to prepare an EIS every time it takes an action consistent with past conduct would grind agency decisionmaking to a halt. *Cf. Marsh* v. *Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989) (explaining that requiring a supplemental EIS every time new information is available "would render agency decisionmaking intractable"); *Grand Canyon Trust*, 691 F.3d at 1022 (noting it would be neither pragmatic nor realistic to require an agency to prepare an EIS when it engages in "routine and required annual reporting").

**2.**  Petitioner claims the EA arbitrarily concludes that flexible winter operations will have only an incremental impact on the spread of the flowering rush, an invasive species that was discovered around Lake Pend Oreille in 2008.  Because the decision adopting flexible winter operations doesn't trigger NEPA's requirement to publish an EIS, this and Petitioner's other challenges to the EA's finding of no significant impact are moot.  *See Upper Snake River*, 921 F.2d at 234.

Petitioner also argues in passing that, because the flowering rush has never been considered in a NEPA document, "BPA arbitrarily limited its analysis of flowering rush impacts to only the incremental impacts attributable to the new winter fluctuations; BPA never considered the significance of the spread of flowering rush in relation to the Dam's year-round operation."  Agencies have a continuing duty to "prepare supplements to . . . final environmental impact statements" if there are "significant new circumstances or information relevant to environmental concerns" that were not considered in an earlier EIS. 40 C.F.R. § 1502.9(c)(1); *Marsh*, 490 U.S. at 372–74.  The relevant EIS in this case is the 1995 Columbia River Power System Operation Review Environmental Impact Statement (SOR EIS), a programmatic EIS that evaluated a range of alternative management strategies for the 14 federal dams and reservoirs in the Columbia River Power System.  The EA here acknowledges that the SOR EIS did not consider the effect of the dam's operation on the flowering rush and characterizes the rush's spread as "new information."  It nevertheless concludes that there are "no significant new circumstances or information" warranting preparation of a supplemental EIS.

Petitioner may well have a colorable claim that the agencies managing the Albeni Falls Dam must supplement the SOR EIS with an analysis of how year-round dam operations, as compared with flexible winter operations specifically, affect the "seemingly inevitable spread of this invasive species." But this question is outside the scope of this case; Petitioner sought review of "the final decision . . . adopting the 'Flexible Winter Power Operations' at Albeni Falls Dam." Petitioner's opening brief similarly frames the issue as whether BPA violated NEPA by "approving the new winter operations without preparing an up-to-date EIS" and concludes by asking us to "reverse and remand the . . . EA approving the Flexible Winter Operations." Petitioner only mentions in a footnote that BPA might need to prepare a supplemental EIS addressing the impact of year-round dam operations on the flowering rush. We do not "ordinarily consider matters on appeal that are not specifically and distinctly argued" in an opening brief, *Laboa* v. *Calderon*, 224 F.3d 972, 985 (9th Cir. 2000), including those raised only in a footnote, *see id.* at 985 n.8. A later agency decision or action may provide Petitioner occasion to challenge BPA's failure to prepare a supplemental EIS addressing the flowering rush. But the time has passed to do so as part of a challenge to this EA.

We address Petitioner's remaining claims in a memorandum disposition filed concurrently herewith.

**DENIED**.