# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE; PACIFIC
COAST FEDERATION OF FISHERMEN'S
ASSOCIATIONS, INC.,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY
COMMISSION,

*Respondent,*

PACIFIC GAS AND ELECTRIC
COMPANY,

*Respondent-Intervenor.*

No. 05-73064

FERC No. 108

OPINION

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

Argued and Submitted
April 5, 2006—San Francisco, California

Filed December 12, 2006

Before: Mary M. Schroeder, Chief Judge, Stephen S. Trott
and Andrew J. Kleinfeld, Circuit Judges.

Opinion by Chief Judge Schroeder

19351

**COUNSEL**

Trent W. Orr, San Francisco, California, for the petitioner.

Carol J. Banta, Federal Energy Regulatory Commission, Washington, D.C., for the respondent.

William J. Madden, Jr., Washington, D.C., for the respondent-intervenor.

**OPINION**

SCHROEDER, Chief Judge:

This is a petition to review a decision of the Federal Energy Regulatory Commission ("FERC") not to initiate formal con-

sultation with the National Marine Fisheries Service ("NMFS") about the operation of the DeSabla-Centerville hydroelectric project. The project is operated by respondent Pacific Gas and Electric ("PG&E") under a 30-year license that FERC issued in 1980. The petitioners seek the consultation in order to protect Chinook Salmon that were declared a threatened species in 1999.

The petitioners include California Sportfishing Protection Alliance and other environmental groups. The operative statute is section 7 of the Endangered Species Act ("ESA") that provides for formal consultation with NMFS to insure that "agency action" does not jeopardize continued existence of an endangered species. 16 U.S.C. § 1536(a)(2). We have jurisdiction pursuant to the Federal Power Act, 16 U.S.C. § 825(l)(b), to review the FERC orders denying petitioners' petition for consultation and petition for rehearing.

The dispositive issue is whether there was any "action authorized, funded, or carried out" by a federal agency, that would have triggered the ESA's consultation requirement in 1999. 16 U.S.C. § 1536(a)(2). Petitioners in essence are asking for consultation in order to determine whether PG&E should change the manner in which the project is operated pursuant to a license agreement issued by FERC in 1980. We conclude that the statutory language, the regulations promulgated pursuant to the statute, and our case law interpreting them compel the conclusion that the ESA imposes no duty to consult about activities conducted by PG&E pursuant to a previously issued, valid license from FERC.

FERC could unilaterally institute proceedings to amend the license if it so chose. This is because the license agreement itself contains provisions authorizing FERC to modify the license to reflect changing environmental concerns. The ESA and the applicable regulations, however, mandate consultation with NMFS only before an agency takes some affirmative agency action, such as issuing a license. *See Tenn. Valley*

*Auth. v. Hill*, 437 U.S. 153, 186-88 (1978); *W. Watersheds Project v. Matejko*, 456 F.3d 922, 930 (9th Cir. 2006); *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 977 (9th Cir. 2003); 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02. Because FERC took no affirmative action concerning PG&E's existing license, we must deny the petition for review.

## BACKGROUND

The DeSabla-Centerville project is located in Butte County California. It consists of a system of dams, reservoirs, canals, and powerhouses that first divert water from two reservoirs and from Butte Creek into powerhouses for hydroelectric generation, before returning the water to Butte Creek downstream. The operation of the dam system affects the flow of water in the creek, which provides spawning grounds for Chinook Salmon.

FERC may issue licenses to operate such projects for a term of up to 50 years. 16 U.S.C. § 799. PG&E operates this project under a 30-year license issued by FERC in 1980. The license allows FERC to require PG&E to make changes to operations to protect fish and wildlife. It states:

> The Licensee shall, for the conservation and development of fish and wildlife resources, construct, maintain, and operate, or arrange for the construction, maintenance, and operation of such reasonable modifications of project structures and operation, as may be ordered by [FERC] upon its own motion or upon the recommendation of the Secretary of the Interior or the fish and wildlife agency or agencies of any state in which the project or part thereof is located, after notice and opportunity for hearing.

Nineteen years after FERC issued the license, the Chinook was declared a threatened species under the ESA. Endangered

and Threatened Species; Threatened Status for Two Chinook Salmon Evolutionary Significant Units (ESUs) in California, 64 Fed. Reg. 50,394, 50,412 (Sept. 16, 1999).

After many fish died in Butte Creek in 2002 and 2003, NMFS requested FERC to initiate "formal consultation" regarding the project's effects on the Chinook pursuant to 50 C.F.R. § 402.14(a). FERC did not do so. In April 2004, petitioner California Sportfishing petitioned FERC to initiate formal consultation, and FERC denied the petition in August 2004. That denial, as well as the denial of rehearing on March 23, 2005 are the subject of this petition for review.

A major component of formal consultation is the production of a "Biological Opinion." 50 C.F.R. § 402.14(g)(4). In the Biological Opinion, NMFS must determine whether or not the action under review "is likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(h)(3). If NMFS concludes that jeopardy is likely, it must issue "reasonable and prudent alternatives" to the action under review. *Id*. Along with such alternatives, NMFS must issue an "incidental take" statement. *Id*. § 402.14(I). The "incidental take" statement constitutes a permit for the agency or licensee to take endangered species, so long as they implement the reasonable and prudent alternatives and comply with the conditions of the incidental take statement. *Bennett v. Spear*, 520 U.S. 154, 170 (1997).

The existing PG&E license is due to expire in 2009, and early consultation between FERC and NMFS has begun in contemplation of renewal proceedings. *See* 50 C.F.R. § 402.11. In May 2005, California Sportfishing filed this petition for review of the FERC denials of consultation. PG&E has intervened to defend the FERC denials as well as to contend that we lack jurisdiction to review the denials in light of the current preliminary consultations looking toward renewal of the license after its expiration in 2009.

DISCUSSION

A.   Jurisdiction

**[1]** We have jurisdiction to review a FERC order only if (1) it is final, (2) if review would not invade the discretion of the agency, and (3) if, absent review, the petitioner would suffer irreparable harm. *Steamboaters v. FERC*, 759 F.2d 1382, 1388 (9th Cir. 1985). Here, FERC's denial of the petition for consultation is final, and our review would not disturb the exercise of any discretion of the agency.

**[2]** The only issue raised as to our jurisdiction is PG&E's contention that California Sportfishing would not suffer irreparable harm as a result of the operation of the existing license, because consultation is already underway in connection with contemplated 2009 re-licensing proceedings. The gist of PG&E's position is that if there is to be a preliminary Biological Opinion issued in these proceedings as to what might be done to protect the Chinook after 2009, no irreparable harm can result from failure to consult now.

**[3]** The consultation which petitioners seek in this proceeding, however, is aimed at measures to protect the Chinook under the operation of the existing license, and not under the terms of a license that would go into effect sometime in the future. The government suggests that it will act promptly to implement any changes recommended under the preliminary analysis for the new license, and will not wait for the issuance of a new license. There is nothing in the statute, however, that requires the government to take such immediate guidance from the preliminary Biological Opinion issued in connection with license renewal. That opinion will, as a matter of law, apply only to operations under the new license. Petitioners' concern is with ongoing operations that are affecting the Chinook now. There is a showing of irreparable harm and, accordingly, we have jurisdiction to consider whether the stat-

ute, as a matter of law, requires consultation with NMFS in connection with ongoing operations under an existing license.

B.   Whether consultation is required

Section 7(a)(2) of the ESA states:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species. . .

16 U.S.C. § 1536(a)(2).

To support its position that the continuing operation of the project by PG&E is an agency "action" within the meaning of the statute, petitioners point to the Supreme Court's landmark decision in *Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978). There, a project that had been approved repeatedly by Congress was required by the terms of the ESA to remain inoperative. *Id.* at 172. This was because, if the project became operational, it would result in the destruction of the habitat of a newly discovered, but endangered species of snail darter. *Id.* at 171-74. The agency was ordered not to take action to operate the dam. *Id.* at 195.

In that case, the dam had not yet begun to operate and the contemplated government action at issue was its start up. *Id.* at 171. Here PG&E has been operating the DeSabla-Centerville project for more than 20 years. The question is thus whether such ongoing operations are similarly subject to the ESA. The answer requires an examination of the structure of the Act.

Congress could have provided that once a species is listed as threatened or endangered under the ESA, federal agencies must consult with expert agencies like NMFS about the impact of all ongoing operations, including those carried out pursuant to licenses. This is how the petitioners ask us to interpret the ESA. Congress did not so provide, however.

**[4]** The statute requires federal agencies to consult with NMFS or another expert agency in connection with federal agency action in order to "insure that any action . . . is not likely to jeopardize the continued existence" of threatened species. 16 U.S.C. § 1536(a)(2). The statute looks to the future effect of contemplated actions by the agency. The triggering mechanism for consultation is an agency action, not the listing of a species. Because the focus is on the future effect of the agency's action, the statute requires the government to insure that an action "is not likely to" jeopardize an endangered species. 16 U.S.C. § 1536(a)(2). Again, the phrase "likely to" does not refer to present effects but to the future. The regulations reinforce this purpose by requiring the agency to "review its actions at the earliest possible time." 50 C.F.R. § 402.14(a).

**[5]** The leading Supreme Court authority is in accord. In *Tenn. Valley Auth. v. Hill*, the Supreme Court looked to the action about to be taken by the agency to operate the dam. 437 U.S. at 171. The Court held that because such action would jeopardize the habitat of the endangered snail darter, the agency could not begin operating the dam. *Id.* at 173-74. The Court thus focused on the potential effect of the government's contemplated action. The point was made more succinctly in the later case of *Bennett v. Spear*, 520 U.S. at 158, where the Court said an agency must engage in formal consultation "[i]f an agency determines that action it proposes to take may adversely affect a listed species."

The petitioners, nevertheless, contend that PG&E's operation of this project constitutes ongoing agency action that can

trigger a requirement for consultation with the expert agencies. They rely on our decision in *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969 (9th Cir. 2003). The case is instructive, but does not support petitioners here.

**[6]** *Turtle Island* involved an ongoing government program to issue permits for fishing that could cause collateral damage to sea turtles and other endangered species, affecting their survival. *Id.* at 971. We held that once a species was listed as endangered under the ESA, the agency was required to take into account the potential effect on the species before issuing future fishing permits. *Id.* at 977. It is significant for purposes of this case that permits issued in the past were not affected. *Id.*

In *Turtle Island*, we distinguished our decisions in *Sierra Club v. Babbitt*, 65 F.3d 1502 (9th Cir. 1995) and *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001) on the grounds that in those cases, the relevant agency activity had been completed. *Turtle Island*, 340 F.3d at 976-77. In *Sierra Club* the agency had already granted a right of way through forest land to a logging company. *Sierra Club*, 65 F.3d at 1505. Thus consultation for road-building by the logging company was not required. *Id.* at 1509. In *Simpson Timber*, consultation was not required because the agency had already issued an incidental take permit to a logging contractor. *Simpson Timber*, 255 F.3d at 1079.

**[7]** Here, as in both *Simpson Timber* and *Sierra Club* the agency action of granting a permit is complete. The ongoing activity is that of PG&E operating pursuant to the permit. Plaintiffs in this case are not challenging an ongoing program of issuing new permits that underlay our decision in *Turtle Island*.

**[8]** Even more recently, in *W. Watersheds*, 456 F.3d at 930, the plaintiffs challenged the agency's failure to consult on

whether the agency should regulate certain rights-of-way used by private parties to divert water. In rejecting the plaintiffs' challenge, we explained that "Ninth Circuit cases have emphasized that section 7(a)(2) consultation stems only from 'affirmative actions' " of an agency. *Id.* We held that because private parties, and not the government, were diverting the water, there was no agency action triggering a duty to consult. *Id.* at 931.

**[9]** This case is materially the same. PG&E, a private party, operates the hydroelectric project challenged in this case. FERC, the agency, has proposed no affirmative act that would trigger the consultation requirement for current operations.

The petitioners also rely on *Pacific Rivers Council v. Thomas*, 30 F.3d 1050 (9th Cir. 1994), but it does not support their argument either. *Pacific Rivers* involved certain Land and Resource Management Plans ("LRMPs") governing thousands of different projects in two national forests. *Id.* at 1052. After the Forest Service adopted the LRMPs, the Chinook was listed as a threatened species. *Id.* We held that the Forest Service had to initiate formal consultation on the LRMPs because they affected each future project planned in the forests. *Id.* at 1053. We observed that "every individual project planned in both national forests . . . is implemented according to the LRMPs." *Id.* Because they continued to apply to new projects, we concluded that "the LRMPs have an ongoing and long-lasting effect even after adoption," and represented "ongoing agency action." *Id.*

Unlike *Pacific Rivers*, this case involves no such long-lasting effects on new permits. The action was concluded in 1980 when FERC issued the license to PG&E.

**[10]** The regulations promulgated pursuant to the ESA make it clear that the operation of a project pursuant to a permit is not a federal agency action. The regulations expressly define the term "action" to include the granting of licenses

and permits. The definitional regulation provides in relevant part that "action" means:

(a)   actions intended to conserve listed species or their habitat;

(b)   the promulgation of regulations;

(c)   *the granting of licenses, contracts, leases, easements, rights-of-way, permits or grants-in-aid;* or

(d)   actions directly or indirectly causing modifications to the land, water, or air.

50 C.F.R. § 402.02 (*emphasis added*).

[11] Thus the granting of the license to PG&E in 1980 was a federal agency action. *See W. Watersheds*, 456 F.3d at 931. However, the continued operation of the project by PG&E in 1999, when the Chinook Salmon was declared threatened, is not a federal agency action.

Finally, Petitioners point to 50 C.F.R. § 402.03, which provides that Section 7's requirements apply to all actions in which there is "discretionary Federal involvement or control." Petitioners contend that the reopener provisions, contained within Articles 15 and 37 of the license, create such discretionary federal control within the meaning of the regulation.

[12] Article 37 gives FERC the discretionary authority to require changes in the operation of the project, after notice and hearing. Article 15 requires the Licensee to make such modifications as may be ordered after FERC exercises such discretion. Thus, the reopener provisions do no more than give the agency discretion to decide whether to exercise discretion, subject to the requirements of notice and hearing. The reopener provisions in and of themselves are not sufficient to

constitute any discretionary agency "involvement or control" that might mandate consultation by FERC.

## CONCLUSION

**[13]** Petitioners in this case are concerned with only one license, issued in 1980, authorizing PG&E to operate the project for thirty years. There is no ongoing government action within the meaning of the ESA. The only relevant agency action now under contemplation is the renewal of the license. Consultation for the renewal, according to the parties, has already begun. The agency, is not required to initiate separate consultation with respect to PG&E's operation of the project under the existing, 1980 license agreement.

The petition for review is DENIED.