# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GRAND CANYON TRUST,
                *Plaintiff-Appellant,*

       v.

UNITED STATES BUREAU OF
RECLAMATION; UNITED STATES
FISH AND WILDLIFE SERVICE;
MICHAEL L. CONNOR,
Commissioner U.S. Bureau of
Reclamation,
            *Defendants-Appellees,*

STATE OF ARIZONA; STATE OF
NEVADA; COLORADO RIVER
COMMISSION OF NEVADA; STATE OF
COLORADO; SOUTHERN NEVADA
WATER AUTHORITY; CENTRAL
ARIZONA WATER CONSERVATION
DISTRICT; NEW MEXICO INTERSTATE
STREAM COMMISSION; STATE OF
UTAH; STATE OF WYOMING;
STATE OF NEW MEXICO; STATE OF
CALIFORNIA; COLORADO RIVER
ENERGY DISTRIBUTORS ASSOCIATION;
SOUTHERN CALIFORNIA
METROPOLITAN WATER DISTRICT;
IMPERIAL IRRIGATION DISTRICT,
    *Intervenor-Defendants-Appellees.*

No. 11-16326

D.C. No.
3:07-cv-08164-DGC

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

11341

Argued and Submitted
June 11, 2012—San Francisco, California

Filed August 13, 2012
Amended September 17, 2012

Before: Ferdinand F. Fernandez, Ronald M. Gould, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Gould

## COUNSEL

McCrystie Adams (argued), Earthjustice, Denver, Colorado, and Neil Levine, Grand Canyon Trust, Denver, Colorado, for the appellant-plaintiff.

Ignacia S. Moreno, Assistant Attorney General, Mark R. Haag and David C. Shilton (argued), Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for the appellees-defendants.

Kenneth C. Slowinski and Nicole D. Klobas, Arizona Department of Water Resources, Legal Division, Phoenix, Arizona; Kamala D. Harris, California Attorney General, Kathleen A. Kenealy, Senior Assistant Attorney General, and Gary E. Tavetian, Deputy Attorney General, Los Angeles, California; John W. Suthers, Colorado Attorney General, and Karen M. Kwon (argued), First Assistant Attorney General, Denver, Colorado; Catherine Cortez Maso, Nevada Attorney General, and Jennifer T. Crandell, Senior Deputy Assistant Attorney General, Las Vegas, Nevada; Dana R. Walsh, Southern Nevada Water Authority, Las Vegas, Nevada; Gary K. King, New Mexico Attorney General, Stephen R. Farris, Assistant Attorney General, Anne Moore, Assistant Attorney General, and Amy Haas, Special Assistant Attorney General, Santa Fe, New Mexico; Mark L. Shurtleff, Utah Attorney General, Norman K. Johnson, Natural Resources Division Chief, and Michael M. Quealy, Assistant Attorney General, Salt Lake City, Utah; Gregory A. Phillips, Attorney General, Peter K.

Michael, Chief Deputy Attorney General, and Jeremiah I. Williamson, Assistant Attorney General, Cheyenne, Wyoming; Kathy Robb, Hunton & Williams LLP, New York, New York; Jay M. Johnson and Suzanne Ticknor, Central Arizona Project, Phoenix, Arizona; Marcia L. Scully, Joseph A. Vanderhorst, and Peter E. Von Hamm, Metropolitan Water District of Southern California, Los Angeles, California; John P. Carter, Horton, Knox, Carter & Foote, El Centro, California; Bennett W. Raley, Trout, Raley, Montaño, Witwer & Freeman, P.C., Denver, Colorado, for the intervenors-appellees.

---

## ORDER

The opinion filed on August 13, 2012 and published at ___ F.3d ___, 2012 WL 3264499, is AMENDED as follows:

At slip opinion page 9166, line 20, change <Reclamation> to <FWS>. The amended sentence states:

> Because FWS used the draft 2009 Recovery Goals as best available science, a discretionary use, the district court concluded that it lacked jurisdiction to consider the draft 2009 Recovery Goals under the ESA citizen suit provision.

At slip opinion page 9168, line 1, change <Reclamation> to <FWS>. The amended sentence states:

> Here, FWS used the draft 2009 Recovery Goals to satisfy its obligation to address the recovery of the humpback chub in the 2009 BiOp.

Future petitions for rehearing and rehearing en banc will not be entertained.

**IT IS SO ORDERED.**

## OPINION

GOULD, Circuit Judge:

Grand Canyon Trust appeals the district court's grant of summary judgment in favor of the United States Bureau of Reclamation ("Reclamation") and the United States Fish and Wildlife Service ("FWS") rejecting the Trust's claims alleging that Reclamation and FWS violated the Endangered Species Act, the National Environmental Policy Act and the Administrative Procedure Act in the operation of the Glen Canyon Dam. We have jurisdiction under 28 U.S.C. § 1291. We dismiss as moot in part and affirm in part.

**I**

Grand Canyon Trust ("the Trust") is an organization devoted to the protection and restoration of the canyon country of the Colorado Plateau. Reclamation and FWS are agencies within the Department of the Interior. Reclamation is responsible for the operation of the Glen Canyon Dam ("the Dam") situated on the Colorado River, and FWS is responsible for the protection of the humpback chub, a fish that exists primarily in the relatively inaccessible canyons of the Colorado River and that is listed as endangered under the Endangered Species Act ("ESA"). Intervenor-Appellees are the seven Colorado River Basin States of Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming; the Colorado River Commission of Nevada; the Southern Nevada Water Authority; the Colorado River Energy Distributors Association; the Central Arizona Water Conservation District; the Imperial Irrigation District; and the Metropolitan Water District of Southern California (collectively, "Intervenors").

**A**

We first review the statutory framework relevant to this appeal. "The ESA reflects a conscious decision by Congress

to give endangered species priority over the primary missions of federal agencies." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir.) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978) (internal quotations marks omitted)) *cert. denied* 132 S. Ct. 366 (2011). Under the ESA, a federal agency must ensure that an "agency action" is not likely to jeopardize the continued existence of any listed species or destroy or adversely modify the critical habitat of any listed species. 16 U.S.C. § 1536(a)(2); *see Kraayenbrink*, 632 F.3d at 495 ("The heart of the ESA is section 7(a)(2), 16 U.S.C. § 1536(a)(2)."). If the agency action "may affect" any listed species, the acting agency must formally consult with the federal agency responsible for the protection of the species in question ("the consulting agency"). 16 U.S.C. § 1536 (a), (b); 50 C.F.R. § 402.14(a); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998).[1]

To begin formal consultation, the acting agency must make a written request describing the circumstances of the request and must provide the consulting agency with the best available scientific and commercial data. 50 C.F.R. § 402.14(c), (d). After considering the submissions, the consulting agency must issue a biological opinion ("BiOp") stating its position as to whether the agency action will jeopardize or adversely modify or destroy the critical habitat of a listed species. 16 U.S.C. § 1536(b)(3)(A). If the consulting agency issues a BiOp indicating that the agency action jeopardizes a listed species, the consulting agency must suggest reasonable and prudent alternatives to the acting agency that mitigate the negative environmental effects of the agency action. *Id.*

---

[1]"If an agency determines that an action 'may affect' critical species or habitats, formal consultation is mandated." *Id.* at 1126. "The purpose of consultation is to obtain the expert opinion of wildlife agencies to determine whether the action is likely to jeopardize a listed species or adversely modify its critical habitat and, if so, to identify reasonable and prudent alternatives that will avoid the action's unfavorable impacts." *Karuk Tribe of Cal. v. United States Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc).

The ESA also prohibits the acting agency from "taking"[2] a threatened or endangered species in the course of the agency action. 16 U.S.C. § 1538(a)(1)(B), (G). If the consulting agency determines that the agency action may incidentally "take" a threatened or endangered species, the consulting agency must issue an incidental take statement ("ITS"), specifying, *inter alia*, the impact of the incidental taking and reasonable and prudent measures that minimize the impact. 16 U.S.C. § 1536(b)(4), (o)(2); *Bennett v. Spear*, 520 U.S. 154, 158, 170 (1997).[3]

The National Environmental Policy Act ("NEPA") requires that an environmental impact statement ("EIS") be issued for every "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11. An EIS must carefully assess the environmental impact of the proposed action, unavoidable environmental effects, and alternatives to the proposed action. 42 U.S.C. § 4332(C). An agency undertaking a major federal action may first prepare an environmental assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. § 1508.9. If after conducting an EA the agency determines that the proposed action will not result in a significant impact, the agency must issue a finding of no significant impact ("FONSI") in lieu of an EIS. 40 C.F.R. §§ 1508.9, 1508.13; *Barnes v. United States Dep't. of Transp.*, 655 F.3d 1124, 1131 (9th Cir. 2011).

---

[2]"The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

[3]"Thus, the [ITS] constitutes a permit authorizing the action agency to 'take' the endangered or threatened species so long as it respects the Service's 'terms and conditions.' The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species is subject to substantial civil and criminal penalties, including imprisonment." *Id.* at 170.

**B**

The Colorado River Storage Project Act of 1956 authorized the construction of the Dam. *See* 43 U.S.C. § 620 *et seq*. Finished in 1963, the Dam is located on the Colorado River in Northern Arizona, and it creates Lake Powell, the second largest reservoir in the United States, which provides drinking water for more than 25 million people. Also, the Dam each year produces more than 3 million megawatt hours of electricity.

The Colorado River Basin Project Act of 1968 ("CRBPA") required the Secretary of the Interior ("the Secretary") to adopt criteria for the long-range operation of all reservoirs and dams constructed and operated under the CRBPA, including the Dam. *See* 43 U.S.C. § 1552(a). The Secretary adopted the Long-Range Operating Criteria in 1970, which established a minimum annual water release from Lake Powell of 8.23 million acre feet.[4] *See* Colorado River Reservoirs: Coordinated Long-Range Operation, 35 Fed. Reg. 8,951-52 (June 10, 1970). The CRBPA also required the Secretary to transmit annual operating plans ("AOPs") to Congress and the Governors of the Colorado River Basin States. *See* 43 U.S.C. § 1552(b). AOPs must describe "the actual operation under the adopted criteria for the preceding compact water year and the projected operation for the current year." *Id.*

The placement and management of the Dam have changed the historical flow and characteristics of the Colorado River below the Dam. The Dam traps a large majority of the sediment that would otherwise flow down the Colorado River, impairing critical habitat of the humpback chub below the Dam.[5]

---

[4]An "acre foot" of water is the amount of water needed to cover one acre of land to a depth of one foot.

[5]*See* 16 U.S.C. § 1532(5)(A); 50 C.F.R. § 424.12. 173 miles of the Colorado River and 8 miles of the Little Colorado River have been designated as critical habitat for the humpback chub.

Also, the average temperature of the River below the Dam is cooler because the Dam releases waters from the deeper and colder reaches of Lake Powell. This harms the humpback chub, which thrives in warmer waters.

In part to address this and other negative environmental consequences of the Dam, Congress passed the Grand Canyon Protection Act of 1992 ("GCPA"). The GCPA requires the Secretary generally to operate the Dam "in such a manner as to protect [and] mitigate adverse impacts" on the environment and specifically required the Secretary, by 1994, to "complete a final Glen Canyon Dam [EIS], in accordance with [NEPA]." Pub. L. No. 102-575, §§ 1802(a), 1804(a), (c)(1)(A). The GCPA also codified Reclamation's obligation to complete and to transmit to Congress and the Governors of the Colorado River Basin States an AOP describing the operation of the Dam for the preceding year "and the projected year operations undertaken pursuant to [the GCPA]." *Id.* at § 1804(c)(2). In preparing that AOP, Reclamation is required to consult with members of the general public, including academics and scientists, environmental organizations, the recreation industry, and purchasers of Federal power generated by the Dam. *Id.* at § 1804(c)(3).

Reclamation completed its Final EIS in 1995, in which it evaluated several alternatives for managing the Dam, including operation under a modified low fluctuating flow ("MLFF") regime and operation under a seasonally-adjusted steady flow ("SASF") regime. MLFF implements fluctuating water releases from the Dam which vary depending on demand for electricity.[6] With this approach, water releases would tend to be higher in summer and winter, corresponding with greater electricity demand, and lower in the spring and fall, corresponding with decreased electricity demand. SASF, on the other hand, mimics the natural flow of the River, by

---

[6]Between 1963 and 1991, Reclamation operated the Dam in a manner similar to MLFF, namely in primary response to power demand.

implementing high, steady flows in the spring and low, steady flows in the summer and fall. In 1996, the Secretary selected MLFF as the Dam's specific operating criteria in a NEPA-required Record of Decision. 40 C.F.R. § 1505.2; Operating Criteria and 1997 Annual Plan of Operations for Glen Canyon Dam, 62 Fed. Reg. 9,447 (March 3, 1997).

Reclamation formally consulted with FWS regarding the operation of the Dam under MLFF. FWS then issued a 1994 BiOp ("the 1994 BiOp") concluding that MLFF jeopardized the humpback chub and adversely modified its critical habitat. FWS suggested reasonable and prudent alternatives to address the adverse environmental effects of MLFF. They included the development of an adaptive management program ("AMP") to study the impact of flows and to implement recommendations necessary for survival and recovery of listed species,[7] and the implementation of a program of experimental flows and associated studies designed to address the negative impact of the Dam on listed species.

Through the AMP process, Reclamation adopted a 2008 Experimental Plan ("the 2008 Plan") that continued the MLFF system as the operating criteria and also called for a one-time high water release in March 2008, intended to replenish sediment in the River below the Dam, and steady flows in September and October of 2008 through 2012. Per NEPA requirements, Reclamation completed an EA with respect to the 2008 Plan and concluded that the environmental impact would not be significant.

Reclamation also formally consulted with FWS regarding the 2008 Plan, and FWS issued a new BiOp ("the 2008 BiOp") that expressly superseded the 1994 BiOp. FWS concluded that the 2008 Plan, implemented in accordance with

---

[7]To implement AMP, Reclamation formed the Adaptive Management Working Group ("AMWG") that makes recommendations to the Secretary about the Dam's operation. The Trust is a member of AMWG.

MLFF operation, did not jeopardize the humpback chub or adversely modify or destroy its critical habitat and that operation of the Dam under MLFF generally no longer jeopardized the humpback chub or adversely modified or destroyed its critical habitat. Thus, the 2008 BiOp reversed FWS's long-held "jeopardy" position, as previously expressed in the 1994 BiOp.

## C

The Trust then filed suit in the District of Arizona, alleging that Reclamation violates the ESA by not consulting with FWS on the development of each of the Dam's AOPs; that Reclamation violates NEPA by not preparing an EA or EIS for each AOP; and that FWS's 2008 BiOp violates the ESA.[8] The district court granted summary judgment to Reclamation, concluding that AOPs are not "agency action[s]" subject to ESA's consultation requirements,[9] and that AOPs are not "major federal action[s]" triggering compliance with NEPA procedural requirements. As to whether the 2008 BiOp violated the ESA, the district court granted summary judgment to the Trust. The district court found that the portions of the 2008 BiOp approving the 2008 Plan were valid, but invalidated FWS's reversal of its long-held position that MLFF jeopardized the humpback chub and adversely modified or destroyed its critical habitat. The district court decided that the 2008 BiOp lacked a reasoned basis, under the best available science, for FWS's new conclusion that MLFF does not

---

[8]The procedural history of this action is extensive. In all, the Trust alleged 13 claims against Reclamation and FWS, which the district court addressed in four separate orders. We recount those claims relevant to the Trust's appeal.

[9]The district court reasoned: (1) that AOPs describe mere projections about water releases from the Dam; (2) that actual release decisions are made during the course of the year; (3) that the Trust's real complaint was with the Record of Decision that implemented MLFF as the operating criteria for the Dam; (4) and that Reclamation has no discretion to deviate from that decision through AOPs.

destroy or adversely modify chub critical habitat and lacked a discussion on the effects of MLFF on chub recovery. The district court remanded the 2008 BiOp to FWS for reconsideration in light of the district court's decision.

In response to the district court's remand, FWS issued a 2009 Supplement to the 2008 BiOp which together with the 2008 BiOp constituted the 2009 BiOp. In the 2009 BiOp, FWS explained its conclusion that the operation of the Dam under MLFF no longer jeopardized the humpback chub or adversely modified or destroyed its critical habitat, and, consistent with ESA requirements, included an incidental take statement ("2009 ITS") that specified the level of humpback chub "take" permissible under MLFF operations. The Trust then filed a second supplemental complaint asserting that the 2009 BiOp and the 2009 ITS violate the ESA; that the 2009 ITS violates NEPA; and that FWS's draft 2009 Recovery Goals, on which FWS relied to address humpback chub recovery in the 2009 BiOp, violate the ESA.

As to whether FWS violated NEPA with respect to the 2009 ITS, the district court gave summary judgment to FWS, concluding that the issuance of the 2009 ITS was not a major federal action requiring NEPA compliance. With respect to the draft 2009 Recovery Goals, the district court granted summary judgment to FWS, concluding that the district court lacked jurisdiction under the APA to consider the 2009 Recovery Goals because they are in draft form and are not a "final agency action" subject to APA review. The district court also concluded that it lacked jurisdiction to review the draft 2009 Recovery Goals under the citizen suit provision of the ESA because FWS had yet to violate the ESA's mandate that recovery goals be submitted for public notice and comment and peer review before final approval.

The district court granted summary judgment to FWS as to the 2009 BiOp, and summary judgment to the Trust as to the 2009 ITS. The district court concluded that FWS fulfilled its

duty under the APA to explain its new position regarding MLFF, but concluded that the 2009 ITS was insufficient under the ESA because FWS did not sufficiently explain why the take of young chub could not be quantified, did not provide a causal link between the adult-based surrogate used and the take of young chub, and did not provide a rational explanation why no additional reasonable and prudent measures were necessary. The district court remanded the 2009 ITS to FWS for reconsideration in light of the district court's decision.

In response to the district court's ruling, FWS issued a 2010 ITS that replaced the 2009 ITS, and the Trust again supplemented its complaint alleging that the 2010 ITS violates the ESA and NEPA. The district court granted summary judgment to FWS, concluding that the 2010 ITS had cured the problems that the district court previously identified in the 2009 ITS, and that the 2010 ITS was not a major federal action subject to NEPA compliance.

The Trust then filed this appeal raising issues: (1) whether the 2009 BiOp is unlawful under the ESA; (2) whether the court has jurisdiction to review the 2009 Recovery Goals; (3) whether Reclamation violates the ESA by relying on the 2009 BiOp; (4) whether FWS's 2010 ITS is unlawful; (5) whether Reclamation violates the ESA by relying on the 2010 ITS; and (6) whether Reclamation must comply with the ESA and with NEPA procedures before issuing an AOP.

**II**

We review *de novo* the district court's grant of summary judgment. *Karuk Tribe*, 681 F.3d at 1017. A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review Reclamation and FWS's compliance with the ESA and with NEPA under the standard set forth in

the APA. *Karuk Tribe*, 681 F.3d at 1017. "Under the APA, a court may set aside an agency action if the court determines that the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* (quoting 5 U.S.C. § 706(2)(A)). We review *de novo* the district court's decision regarding subject matter jurisdiction. *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1226 (9th Cir. 2005).

## III

After the Trust filed its notice of appeal and pursuant to Reclamation's January 2011 request to initiate formal consultation on Reclamation's proposed 10-year continued operation of the Dam under MLFF along with High Flow Experimental Releases and non-native fish controls, FWS issued a new 2011 BiOp and 2011 ITS, which cover the operation of the Dam through 2020.[10] The 2011 BiOp and 2011 ITS have supplanted the 2009 BiOp and the 2010 ITS, the documents at issue in this appeal. We first address the issue of mootness in light of these intervening developments.

**[1]** "The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011). "A claim is moot if it has lost its character as a present, live controversy." *Am. Rivers v. Nat'l Marine*

---

[10]We GRANT the Intervenors-Appellees' unopposed motion to take judicial notice of: 1) the 2011 Annual Operating Plan for Colorado River Reservoirs; 2) excerpts from the Colorado River September 24 Month Study (2011); and 3) FWS's Final 2011 BiOp.

We DENY the Trust's motion to take judicial notice of, or in the alternative to supplement the record with, various ESA consultation and NEPA documents, as listed in the Trust's motion. We DENY the Trust's motion to supplement the record with "The Rahel Study" and the Trust's motion to supplement the record with the November 26, 2007 letter from the Trust to the Office of the Solicitor in the Department of the Interior.

*Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997). "If an event occurs that prevents the court from granting effective relief, the claim is moot and must be dismissed." *Id.*

[2] We have held that the issuance of a superseding BiOp moots issues on appeal relating to the preceding BiOp. *See id.* at 1124; *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071 (9th Cir. 1995)[11]; *see also Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1111-12 (10th Cir. 2010) (concluding that a superseding BiOp mooted issues related to the validity of previous BiOps). Here, there is no dispute that the 2009 BiOp and the 2010 ITS have been replaced by the 2011 BiOp and the 2011 ITS. Defendants-Appellees argue, and the Trust concedes, that the Trust's claims related to the 2009 BiOp and the 2010 BiOp are now moot. We agree. The Trust's claims that the 2009 BiOp is unlawful under the ESA; that Reclamation violates the ESA by relying on the 2009 BiOp; that the 2010 ITS is unlawful; and that Reclamation violates the ESA by relying on the 2010 ITS are moot. We turn to the remaining issues.

---

[11]In *Idaho Department of Fish & Game*, we considered a challenge to the National Marine Fisheries Service's 1993 BiOp. Because the district court issued its judgment that the 1993 BiOp was arbitrary and capricious just twelve days before the 1993 BiOp's expiration, by the time the matter came up on appeal, the 1993 BiOp had been superseded by the 1994-1998 BiOp. *Id.* at 1074. We concluded that the challenge to the 1993 BiOp was mooted by the issuance of the superceding 1994-1998 BiOp. *Id.* at 1074-75.

Similarly, in *American Rivers v. National Marine Fisheries Service*, we considered another challenge to the same 1994-1998 BiOp at issue in *Idaho Dep't of Fish & Game*. Appellants challenged the validity of the 1994-1998 BiOp, which was then itself replaced by the 1995 BiOp. *Am. Rivers*, 126 F.3d at 1123. We concluded that the appeal was moot by virtue of that replacement. *Id.* at 1124 ("As in *Idaho Dep't of Fish & Game*, the biological opinion in the present case has been superseded by the 1995 Biological Opinion. Therefore, any challenge to the 1994-1998 Biological Opinion is moot.").

**A**

The Trust contends that Reclamation violates the ESA by not consulting with FWS before issuing each AOP. The district court concluded that Reclamation's decision not to consult with FWS under the ESA does not violate APA standards. The district court reasoned that AOPs are not the kind of affirmative "agency action" requiring formal consultation under the ESA and its implementing regulations because in issuing each AOP, Reclamation does not exercise discretion that could inure to the benefit of the humpback chub. We agree.

**[3]** The ESA requires formal consultation when a federal agency "authorize[s], fund[s], or carrie[s] out" any action that may affect a listed species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a); *Karuk Tribe*, 681 F.3d at 1020. Federal regulation limits this consultation requirement "to all actions in which there is *discretionary* Federal involvement or control." 50 C.F.R. § 402.03 (emphasis added). In *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), the Supreme Court acknowledged this regulatory limitation, stating that "the ESA's requirements would come into play only when an action results from the exercise of agency discretion." *Id.* at 665. ESA consultation requirements do not apply to an action "that an agency is *required* by statute to undertake once certain specified triggering events have occurred." *Id.* at 669 (emphasis in original); *see Karuk Tribe*, 681 F.3d at 1021 ("[T]his limitation harmonizes the ESA consultation requirement with other statutory mandates that leave an agency no discretion to consider the protection of listed species.").

**[4]** We have further held that "the ESA consultation requirement applies only if the agency has the discretionary control 'to inure to the benefit of a protected species.' " *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1033 (9th Cir. 2005) (quoting *Turtle Island Restoration Network v. Nat'l Marine*

*Fisheries Serv.*, 340 F.3d 969, 977 (9th Cir. 2003)).[12] The parties here primarily dispute whether the issuance of an AOP is a discretionary act that triggers the ESA's consultation requirement, and we determine that this issue controls our rejection of an ESA consultation requirement concerning production of each AOP.

**1**

The Supreme Court has said that "not every action authorized, funded, or carried out by a federal agency is a product of that agency's exercise of discretion." *Home Builders*, 551 U.S. at 668. In *Home Builders*, the Court considered whether the United States Environmental Protection Agency ("EPA") exercised the requisite discretion for the purposes of the ESA consultation requirement when, under the Clean Water Act ("CWA"), EPA transferred pollution discharge permitting authority to a state requesting the transfer. The Court noted that the CWA mandated the transfer after nine specified criteria were met, without reference to additional compliance with ESA consultation requirements. *Id.* at 671-72. The Court concluded that although EPA exercised some discretion in determining whether a state had met the specified criteria, once EPA decided that the state satisfied all nine criteria, EPA did not have discretion, under the CWA, to deny the transfer. *Id.*

Here, Reclamation is required by statute to prepare and submit an AOP each year to Congress and the Governors of the Colorado River Basin States. 43 U.S.C. § 1552(b); Pub. L. No. 102-575, § 1804(c)(2). The Trust argues that because the specific content of each AOP is not dictated by statute, Recla-

---

[12]More recently, we explained: "Our 'agency action' inquiry is twofold. First, we ask whether a federal agency affirmatively authorized, funded, or carried out the underlying activity. Second, we determine whether the agency had some discretion to influence or change the activity for the benefit of a protected species." *Karuk Tribe*, 681 F.3d at 1021.

mation is left with the discretion to decide, through the AOP process, to operate the Dam in a manner that would benefit the humpback chub by choosing to implement SASF, or some other similar flow regime.

[5] The plain language of the CRBPA, however, belies that Reclamation, through the AOP process, exercises that sort of discretion. The CRBPA provides that AOPs must "describ[e] the actual operation [of the Dam] *under the adopted criteria* for the preceding compact water year and the projected operation for the current year." 43 U.S.C. § 1552(b) (emphasis added). As stated above, the adopted operating criteria for the Dam is MLFF which was selected by the Secretary in 1996 in the NEPA-required Record of Decision, and Reclamation does not have the discretion, through its promulgation of an AOP, to deviate from the implementation of MLFF. The statute underscores that reality by limiting the content of each AOP to a mere description of how Reclamation in the past year has, and in the upcoming year will, operate the Dam "*under the adopted criteria*." In this light, we conclude that the statute requires Reclamation to "perform [a] specific nondiscretionary act[ ] rather than achieve broad goals;" namely, Reclamation does not have the discretion to select different operating criteria for the Dam by saying so in an AOP. *Karuk Tribe*, 681 F.3d at 1024. In other words, Reclamation does not exercise discretion signifying agency action requiring ESA consultation compliance.

That the statute does not dictate with specificity the precise content of each AOP does not detract from this conclusion. The operation of the Dam is subject to some uncertainty, which stems from variances in hydrologic conditions, such as snowpack, and in yearly electricity and water demand, based on obligations established by the so-called Law of the River,[13]

---

[13]The "Law of the River" comprises the legal obligations that govern the allocation and use of the water of the Colorado River. *See, e.g.*, *Arizona v. California*, 547 U.S. 150 (2006). It includes both inter-state and international agreement with respect to the River's use.

that are necessarily unknowable before their occurrence but affect the operation of the Dam. For example, a year with extreme temperatures might increase the demand for electricity necessary to run heating and cooling systems. Reclamation exercises some discretion in preparing each AOP insofar as Reclamation must make projections about how it will operate the Dam for the upcoming year based on forecasts. That discretion, however, does not affect Reclamation's specific, non-discretionary obligation to implement MLFF in its operation of the Dam, which the Trust identifies as the primary harm to the humpback chub.

The crux of Reclamation's decision-making process on water flows and other features of the Dam's operation is in its establishment of operating criteria for the Dam, such as use of MLFF rather than SASF, and interested parties had opportunity to challenge agency decisions on the Dam's operating criteria. It is neither practical nor required by law to permit challenges to each operating plan that is necessarily fashioned reflecting the operating criteria in its current setting.

The 2008 AOP, which the Trust challenges, suggests limitations on discretion imposed on Reclamation in its preparation and issuance of an AOP. In it, Reclamation describes its statutory mandate as follows:

> This 2008 Annual Operating Plan (AOP) was developed in accordance with Section 602 of the Colorado River Basin Project Act . . . and the Criteria for Coordinated Long-Range Operation of Colorado River Reservoirs Pursuant to the Colorado River Basin Project Act of September 30, 1968 (Operating Criteria), as amended, promulgated by the Secretary of the Interior "(Secretary)". This AOP implements the requirement of Section 602(b) of the Colorado River Basin Project Act that the Secretary annually prepare "a report describing the actual operation under the adopted critera [i.e., the Operating

> Criteria] for the preceding compact water year [i.e., from October 1 to September 30] and the projected operation of the current year."
>
> In accordance with the [CRBPA] and the Operating Criteria, the AOP must be developed and administered consistent with applicable Federal laws . . . and other documents relating to the use of the waters of the Colorado River, which are commonly and collectively known as the "Law of the River."

Reclamation further describes the 2008 AOP's purpose as follows:

> The purposes of the AOP are to determine or address: (1) the projected operation of the Colorado River reservoirs to satisfy project purposes under varying hydrologic and climatic conditions; (2) the quantity of water considered necessary to be in storage in the Upper Basin Reservoirs . . . pursuant to Section 602(a) of the Colorado River Basin Project Act; (3) water available for delivery pursuant to the 1944 United States-Mexico Water Treaty and Minutes No. 242 and 310 of the International Boundary and Water Commission . . . ; (4) whether the reasonable consumptive use requirements of mainstream users in the Lower Division States will be met under a 'Normal,' 'Surplus,' or 'Shortage' Condition as outlined in . . . the Operating Criteria and as implemented by the Interim Guidelines; and (5) whether water apportioned to, but unused by one or more Lower Division States exists and can be used to satisfy beneficial consumptive use requests of mainstream users in other Lower Division States as provided in the Consolidated Decree of the Supreme Court of the United States in *Arizona v. California*, 547 U.S. 150 (2006).

This description supports the conclusion that the AOP is merely a descriptive tool by which Congress and the Governors of the Colorado River Basin States may be kept apprised of how Reclamation is meeting its multiple preexisting obligations while implementing MLFF at the Dam.

The GCPA reinforces that it was not Congress' intention to subject AOPs to ESA consultation requirements. The Act explicitly requires Reclamation, in preparing each AOP, to consult with the Governors of the Colorado River Basin States and with members of the general public, including academics and scientists, environmental organizations, the recreation industry, and those who buy power that the Dam produces. Pub. L. No. 102-575, § 1804(c)(3). This list indicates that Congress knew how to mandate consultation in the preparation of each AOP, yet chose not to include in that list formal consultation under the ESA. We read that exclusion to mean that Congress did not intend that Reclamation comply with the ESA before issuing an AOP. *See Home Builders*, 551 U.S. at 663 (concluding that the addition of implicit ESA compliance to the explicitly enumerated criteria for transfer would impermissibly alter the CWA's statutory mandate).

**[6]** Because we conclude that Reclamation, in preparing each AOP describing the operation of the Dam, does not exercise discretion that inures to the benefit of the chub, we hold that Reclamation does not violate the ESA by issuing each AOP without formally consulting with FWS.

## 2

Our decision in *California Sportfishing Protection Alliance v. Federal Energy and Regulatory Commission*, 472 F.3d 593 (9th Cir. 2006), is also instructive with respect to our "agency action" inquiry here. In that case we considered a petition for review of the Federal Energy and Regulatory Commission's ("FERC") decision not to formally consult with the National Marine Fisheries Service ("NMFS") about the continued

operation of the DeSabla-Centerville hydroelectric project, a system of dams, reservoirs, canals, and powerhouses in Butte County, California. In 1980, FERC issued a 30-year operating permit to Pacific Gas and Electric ("PG&E") to operate the DeSabla-Centerville hydroelectric project. *Id.* at 594. Petitioners challenged FERC's decision not to consult formally with NMFS about the continued operation of the hydroelectric project after the Chinook Salmon was declared a threatened species under the ESA in 1999. *Id.* We decided that the relevant "agency action" was the granting of the permit in 1980. *Id.* at 598. Since FERC consulted with NMFS before issuing the permit to PG&E, and because that agency action was complete, we held that PG&E's continued operation of the hydroelectric project pursuant to that permit, notwithstanding the subsequent listing of the Chinook Salmon, was merely an ongoing activity that is not agency action for the purpose of ESA consultation. *Id.* at 598-99.

In substance, by challenging the AOPs and urging each one requires separate ESA consultation, the Trust is continuously challenging Reclamation's implementation of MLFF on an annual basis and its purported effects on the humpback chub. It is truly the selection of MLFF as the operating criteria which creates the environmental effects of concern to the Trust, and so the "agency action," for the purposes of the ESA, with which the Trust truly takes issue was the selection of MLFF as one of the operating criteria, rather than the agency's routine reporting in each AOP. Reclamation, however, fully complied with ESA consultation requirements before the Secretary chose MLFF.[14] Consistent with our decision in *California Sportfishing*, Reclamation's yearly issuance of an AOP is part of Reclamation's ongoing operation of the Dam under MLFF and does not trigger formal consultation under the ESA. *Id.* at 599.

---

[14]Reclamation again complied with ESA consultation requirements when it proposed to alter the operation of the Dam by implementing the 2008 Plan.

Our decision on this is also pragmatically required. It is called for and legally required to permit environmental challenge under the ESA for want of consultation about an endangered or threatened species whenever the agency establishes material operating criteria for a dam, and when it embarks on a significant new direction in its operations. But to allow ESA challenge on an annual basis for each AOP would be unduly cumbersome and unproductive in addressing the substance of environmental issues. Annual challenges could not likely be resolved fully before the next AOP came along, and there is no benefit to endangered species in having an unending judicial process concerning annual reporting requirements that Congress mandated.

## B

The Trust next contends that Reclamation violates NEPA by not preparing either an EA or EIS for each AOP. The district court concluded that AOPs are not major federal actions for which NEPA requires that an EA and/or EIS be prepared. 42 U.S.C. § 4332(C). We agree.

**[7]** In *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232 (9th Cir. 1990), we considered whether Reclamation was required to comply with NEPA before making changes to the flow of water from the Palisades Dam and Reservoir located on the South Fork of the Snake River in Idaho. Reclamation had previously adopted a standard operating procedure in which it maintained the flow of water from the dam in the South Fork at a level above 1,000 cubic feet per second ("cfs"). *Id.* at 233. In response to drought conditions, however, Reclamation reduced the flow to below 1,000 cfs without first preparing an EIS. *Id.* at 234. We noted that "if an ongoing project undergoes changes which themselves amount to 'major Federal actions,' the operating agency must prepare an EIS;" however, we said that "where a proposed federal action would not change the status quo, an EIS is not necessary." *Id.* at 234-35. We characterized the fluctuations in

flow as "routine managerial actions" that Reclamation had continuously implemented while "operating the facility in the manner intended." *Id*. at 235. In that light, we concluded that Reclamation was not required to comply with NEPA when it made changes to the volume of water it released from the Dam based on changes in weather conditions. *Id.* at 235-36.

**[8]** Here, Reclamation is not making material changes to the operating criteria for the Dam when it prepares and issues an AOP. As in *Upper Snake River Chapter of Trout Unlimited*, Reclamation does not change the status quo through the AOP process. Reclamation is not authorized to operate the Dam under another flow regime by simply declaring such a change in an AOP. Instead, as stated above, an AOP merely chronicles Reclamation's ongoing operation of the Dam under the existing operating criteria, MLFF, during the preceding year and projects how Reclamation will do the same in the upcoming year.

**[9]** In addition, we have said that "[t]he standards for 'major federal action' under NEPA and 'agency action' under the ESA are much the same. If there is any difference, case law indicates 'major federal action' is the more exclusive standard." *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996); *see also Karuk Tribe*, 681 F.3d at 1024 ("Although the 'major federal action' standard under NEPA is similar to the more liberal 'agency action' standard under the ESA, *Marbled Murrelet*, 83 F.3d at 1075, the terms are not interchangeable."). Because we conclude above that AOP promulgation is not an agency action subject to ESA-mandated consultation, it follows that AOP promulgation does not trigger compliance with NEPA procedural requirements. *Marbled Murrelet*, 83 F.3d at 1075 ("Where, as here, there is no 'agency action' under what is probably the more liberal standard of the ESA, there is no 'major federal action' under the more exclusive standard of NEPA.").

**[10]** Our conclusion above that producing an AOP is not a major federal action requiring compliance with NEPA pro-

cedures is also reinforced by the same pragmatic and realistic concerns that supported our decision that AOPs do not routinely require ESA consultation. Similarly, we hold that Reclamation is not required to comply with NEPA procedural requirements before preparing each AOP for the Dam. The time for an agency to give a hard look at environmental consequences, and the opportunity for serious NEPA litigation on whether alternatives were adequately considered, should come in this context at the points where an agency establishes operating criteria for a dam, or embarks on some significant shift of direction in operating policy, not merely when there is routine and required annual reporting.

## C

The Trust next challenges the district court's conclusion that it lacked jurisdiction to review the draft 2009 Recovery Goals for the humpback chub. FWS issued recovery goals for the chub in 2002 ("2002 Recovery Goals"). The district court invalidated them, however, because they did not include time and cost estimates as required by the ESA. Because the district court did not find fault with the science of the 2002 Recovery Goals, FWS restyled them as the draft 2009 Recovery Goals and relied on them as the best available science regarding humpback chub recovery in the 2009 BiOp. *See* 16 U.S.C. § 1536(a)(2) (requiring use of "the best scientific and commercial data available"). Taking into account the science of the draft 2009 Recovery Goals, the district court concluded that FWS, in the 2009 BiOp, cured the recovery-related deficiency that the district court identified in the 2008 BiOp.

The Trust challenged the draft 2009 Recovery Goals, contending that they violated the ESA because they had not been offered for public notice and comment or for peer review. The district court concluded, however, that the court did not have jurisdiction under either the citizen suit provision of the ESA or under the APA to review the draft 2009 Recovery Goals. We agree that under the citizen suit provision of the ESA, the

district court does not have jurisdiction to review the draft 2009 Recovery Goals, and we conclude that the issue of whether the district court similarly lacks jurisdiction under the APA to review the draft 2009 Recovery Goals is moot.

## 1

**[11]** For the purpose of delisting endangered species and threatened species, the ESA requires the Secretary to "develop and implement [recovery plans or goals] for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1). This obligation is separate from the Secretary's obligation to "adequately consider the proposed actions' impacts on the listed species' chances of recovery" in a BiOp. *See Nat'l Wildlife Fed'n. v. Nat'l. Marine Fisheries Serv.*, 524 F.3d 917, 931 (9th Cir. 2008) (affirming the district court's conclusion that a BiOp was "legally deficient" because it did not address recovery).

Recovery goals must include: (1) "site-specific management actions . . . necessary to achieve the plan's goal for the conservation and survival of the species," (2) "objective, measurable criteria" that would lead toward delisting, and (3) time and cost estimates "to carry out those measures." 16 U.S.C. § 1533(f)(1)(B). The Secretary must also provide the opportunity for public notice and comment before final approval of a recovery plan, and "prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period." 16 U.S.C. § 1553(f)(4), (5).

**[12]** The ESA citizen suit provision states that "any person may commence a civil suit on his own behalf . . . against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 . . . *which is not discretionary* with the Secretary." 16 U.S.C. § 1540(g)(1)(C) (emphasis added). The Trust argues that because public notice

and comment, peer review, and the inclusion of time and cost estimates are non-discretionary requirements that the ESA imposes on FWS's approval of recovery goals, FWS's use of the draft 2009 Recovery Goals as the best available science to define recovery of the chub in the 2009 BiOp, without first meeting those non-discretionary requirements, violates the ESA. The district court concluded, however, that it only had jurisdiction under the ESA to consider the draft 2009 Recovery Goals *qua* recovery goals for delisting purposes, their non-discretionary use. Because FWS used the draft 2009 Recovery Goals as best available science, a discretionary use, the district court concluded that it lacked jurisdiction to consider the draft 2009 Recovery Goals under the ESA citizen suit provision. We agree.

Our decision in *Coos County Board of County Commissioners v. Kempthorne*, 531 F.3d 792 (9th Cir. 2008) is analogous and persuasive on the lack of jurisdiction supporting the challenge to the agency use of the draft recovery goals. In *Coos County*, FWS did not delist the marbled murrelet (a seabird) after FWS's determined in a Five-Year Review that marbled murrelets "do not meet the definition of a 'distinct population segment,' one of the population categories which may be protected under the ESA, *see* 16 U.S.C. § 1532(16), but determined that they nonetheless remained threatened." *Id.* at 794. Coos County sued FWS arguing that FWS has a duty to delist the bird. We reasoned that Coos County's "[ESA citizen suit] and [APA] causes of action [could] proceed only if FWS has a nondiscretionary duty to begin the delisting process—promptly or otherwise—as a result of the determination made in the Five-Year Review and has failed to act upon that duty." *Id.* at 803. Deciding that there was no such duty under the statute, we concluded that there was no jurisdiction because "Coos County has not alleged a failure to perform a nondiscretionary act or duty imposed by § 1533, whether premised on the petition process deadlines or on the agency's more general duty to act on its own determinations." *Id.* at 812.

**[13]** Here, the ESA mandates peer review and notice and comment on recovery goals when offered as recovery goals. *See* 16 U.S.C. § 1533(f)(1) ("The Secretary shall develop and implement [recovery plans] for the conservation and survival of endangered species and threatened species listed pursuant to this section"), (f)(4) ("The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan."). Nothing in these provisions either limits the Secretary's use of the science of draft recovery goals to support a BiOp's conclusions about an agency action's effect on a listed species' recovery or mandates that the Secretary meet the requirements of § 1533(f)(4), (5) before such alternate discretionary use. We conclude that the ESA citizen suit provision does not support jurisdiction here because FWS did not fail to perform a non-discretionary act before using the science incorporated in the draft 2009 Recovery Goals to support its 2009 BiOp.

**2**

**[14]** The district court also concluded that it lacked jurisdiction under the APA to review the draft 2009 Recovery Goals because they were not a "final agency action" as required by that statute. 5 U.S.C. § 704. Here, FWS used the draft 2009 Recovery Goals to satisfy its obligation to address the recovery of the humpback chub in the 2009 BiOp. Any inquiry into whether that use violated the APA would require us to delve into the merits of the 2009 BiOp, a document that is no longer operative. Given our conclusion above that issues on appeal related to the 2009 BiOp are moot because the 2009 BiOp has been replaced by the 2011 BiOp, we hold that the issue of whether the APA supports review of the draft 2009 Recovery Goals as used in the 2009 BiOp is also moot.

**[15]** Finally, we vacate the judgment of the district court with respect to the 2009 BiOp and the 2010 ITS. *See Log*

*Cabin Republicans v. United States*, 658 F.3d 1162, 1167-68 (9th Cir. 2011) (per curiam) ("Vacatur ensures that those who have been prevented from obtaining the review to which they are entitled are not . . . treated as if there had been a review. It prevents an unreviewable decision from spawning any legal consequences, so that no party is harmed by what the Supreme Court has called a preliminary adjudication." (internal quotation marks, alterations, and citations omitted)).

**DISMISSED in part; AFFIRMED in part.**